UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

VOLKAN YUCEKUS,

                    Plaintiff,                    **MEMORANDUM & ORDER**
                                                      21-CV-1794(EK)

          -against-

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

------------------------------------x
ERIC KOMITEE, United States District Judge:

          Plaintiff Volkan Yucekus challenges the Social
Security Administration's denial of his claim for disability
insurance benefits.  Before the Court are the parties' cross-
motions for judgment on the pleadings.  For the following
reasons, I grant Yucekus's motion and deny the Commissioner's
cross-motion.

## I.  Background

**A.   Procedural Background**

          On August 25, 2018, Yucekus applied for disability
benefits, alleging a disability onset date on or about January
1, 2009.  Administrative Tr. ("Tr.") 134, ECF No. 11.  The
agency denied his claim, initially on January 9, 2019, *id.* at
155, and again upon reconsideration on April 29, 2019.  *Id.* at
166.  Yucekus appealed that decision to an administrative law
judge.  On January 23, 2020, ALJ Ifeoma Iwuamadi held a hearing

on Yucekus's claim.  *Id*. at 47-77.  The ALJ concluded that
Yucekus was not disabled and therefore not entitled to
disability benefits.  *Id*. at 7-31.  The Appeals Council denied
Yucekus's request for review of the ALJ's decision, rendering
that decision final.  *Id.* at 1-6.  Yucekus timely sought review
of that decision in this Court.

**B.    The ALJ's Disability Evaluation**

Under the Social Security Act, "disability" is defined
as the "inability to engage in any substantial gainful activity
by reason of any medically determinable physical or mental
impairment . . . which has lasted or can be expected to last for
a continuous period of not less than 12 months."  42 U.S.C.
§ 423(d)(1)(A).  The Social Security Administration's
regulations require ALJs to follow a five-step sequence in
evaluating disability claims.  20 C.F.R. § 404.1520(a)(4).

First, the ALJ determines whether the claimant is
engaged in substantial gainful activity.  *Id.*
§ 404.1520(a)(4)(i), (b).  If not, then at step two, the ALJ
evaluates whether the claimant has a "severe impairment" — that
is, an impairment or combination of impairments that
"significantly limits" the claimant's "physical or mental
ability to do basic work activities."  *Id.* § 404.1520(c).  If
the ALJ identifies a severe impairment, then at step three, she
must determine whether it meets or equals one of the impairments

2

listed in Appendix 1 of the regulations (the "Listed Impairments"). *Id.* § 404.1520(d); 20 C.F.R. pt. 404, subpt. P, app. 1. If it does, the ALJ will deem the applicant disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

Here, ALJ Iwuamadi determined that Yucekus had not engaged in substantial gainful activity since the alleged onset date. Tr. 12. She also determined that Yucekus suffered from a number of "severe impairments." These included, most importantly for this appeal: anxiety disorder, schizoaffective disorder, and post-traumatic stress disorder, as well as long thoracic nerve injury, a pinched spinal nerve, and a "winging disorder" of the right scapula. *Id.* The ALJ also determined that Yucekus had one "non-severe impairment": status-post right gluteal surgery. *Id.* at 13. However, the ALJ went on to determine that none of Yucekus's impairments, either individually or in combination, rose to the level of a Listed Impairment. *Id.* at 13-15.

When an ALJ finds that the claimant has severe impairments that do not meet the requirements of the Listings, she must determine a claimant's residual functional capacity ("RFC"), which is the most a claimant can do in a work setting notwithstanding his limitations. 20 C.F.R. 404.1545(a)(1). The ALJ concluded here that Yucekus had the RFC to perform a range of "light work" with limitations. Tr. 15. Those limitations

were that Yucekus could only "perform[] simple, routine tasks" and execute "simple work-related decisions," with "occasional contact with supervisors, co-workers and the public" and "occasional changes in a routine work setting." *Id.* In addition, the ALJ specified that Yucekus could perform work that involved only occasional overhead reaching but frequent reaching in other directions; frequent handling and fingering; occasional climbing ramps and stairs; no climbing ladders, ropes or scaffolds; occasional crawling; no exposure to unprotected heights or moving mechanical parts; and no operating a motor vehicle. *Id.* The ALJ's opinion does not explicitly link any limitation to any specific impairment.

At step four, the ALJ considers whether, in light of the RFC determination, the claimant could perform "past relevant work." 20 C.F.R. § 404.1520(f). Here, the ALJ found that Yucekus had no past relevant work. Tr. 23. At step five, the ALJ evaluates whether the claimant could perform jobs existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(g). Here, she determined that Yucekus could perform certain such jobs, including as a plastic hospital products assembler, housekeeping cleaner, and "laundry assorter." Tr. 24. Given that conclusion, the ALJ determined that Yucekus was not disabled. *Id*.

## II.  Standard of Review

A district court has jurisdiction to review the final judgment of the Commissioner denying an application for Social Security disability benefits.  42 U.S.C. § 405(g).  The review is limited to two questions: whether substantial evidence supports the Commissioner's decision, and whether the Commissioner applied the correct legal standards.  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).[1]

"Substantial evidence means more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008).  "[I]f supported by substantial evidence," the Commissioner's factual findings "shall be conclusive."  42 U.S.C. § 405(g).

## II.  Discussion

Yucekus raises three arguments on appeal, all relating to the ALJ's RFC determination.  Mem. of Law in Supp. of Pl.'s Mot. for J. on the Pleadings ("Pl. Mem.") 9, ECF No. 17.  He argues, first, that the ALJ improperly credited the conclusions of a state agency's medical consultants concerning his mental functioning, over the contrary opinions of Yucekus's treating

---

[1] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

psychiatrist, Dr. James Bernard, and a consultative examiner, Dr. Toula Georgiou.  *Id.* at 11-19; *see* Tr. 21-22 (finding Dr. Bernard's and Dr. Georgiou's opinions "not persuasive" and the medical consultants' opinions "persuasive").  Relatedly, Yucekus contends that the ALJ failed to properly evaluate the medical opinion evidence regarding his right arm impairment.  Pl. Mem. 19-21.  Finally, he asserts that the ALJ improperly evaluated his subjective complaints of pain and his description of the limits on what he could do on a daily basis.  *Id.* at 21-23.  The first of these arguments has merit and warrants remand to the agency.

## A.   Opinion Evidence

Yucekus contends that the ALJ erred by discounting the opinions of Dr. Bernard, Yucekus's treating psychiatrist, and Dr. Georgiou, an examining state consultative psychologist, in favor of two state consultants who reviewed only the paper record.  The examining doctors opined that Yucekus had psychological limitations that would likely impact his ability to regulate his emotions, interact with others, and maintain a regular work schedule.  Tr. 410, 622-23.[2]

_____

[2] Both physicians diagnosed schizoaffective disorder.  Dr. Bernard additionally diagnosed Generalized Anxiety Disorder and Post-Traumatic Stress Disorder, based on symptoms including pervasive anxiety that bad things will happen, difficulty thinking and concentration, and social isolation.  Tr. 619.  He opined that these issues create marked limitations in several mental categories, such as working in coordination with others, completing a workday

For claims filed after March 27, 2017 (like Yucekus's), the "treating physician rule" no longer applies. *See Schillo v. Kijakazi*, 31 F.4th 64, 71 n.1 (2d Cir. 2022); 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . including those from your medical sources.").[3] Instead, the Commissioner must "articulate in [the] determination or decision how persuasive we find all of the medical opinions" in the case record.  20 C.F.R. § 404.1520c(b).

An ALJ must now evaluate all medical opinions and findings based on the following factors, among others: (1) their supportability (*i.e.,* the extent to which a source explains his or her opinion, and supports it with objective medical evidence); (2) consistency (*i.e.,* the extent to which it is consistent with other evidence — medical and nonmedical — in the record), (3) the source's relationship with the claimant (including the length of the relationship and frequency of

---

without interruptions from symptoms, and understanding detailed instructions. *Id.* at 622.  Dr. Georgiou reported that due to his schizoaffective disorder, Yucekus has no friends or family, interests or hobbies, and may have difficulties "regulating his emotions, working at a consistent pace, interacting with others and having to make work related decisions."  Tr. 410.

[3] The regulation that contained the treating physician rule was repealed on January 18, 2017.  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c(c), 416.920c(c) (effective March 27, 2017).

visits), and (4) the source's specialization (*i.e.*, education and training).  20 C.F.R. §§ 404.1520c(c).

The first two factors — supportability and consistency — are the "most important factors," *see id.* § 404.1520c(b)(2); accordingly, the ALJ must explain how she considered them.  *Id.* The regulation does not require the ALJ to explain her consideration of the remaining factors.  *Id.*  These are not especially formalistic requirements.[4]  In the end, an ALJ's conclusion need not "perfectly correspond with any of the opinions of medical sources cited in his decision," so long as she has weighed "all of the evidence available to make an RFC finding that was consistent with the record as a whole."  *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013).

1.  Opinions Regarding Yucekus's Mental Functioning

The ALJ considered the medical opinion evidence of multiple doctors regarding Yucekus's mental functioning: Yucekus's treating psychiatrist, Dr. Bernard; a state consultative psychologist, Dr. Georgiou; and two consultative examiners, Dr. Selesner and Dr. Gawley.  Yucekus began weekly outpatient treatment at Wester Queens Consultation Center in 2017.  Tr. 431-43, 463-64.  In July 2018, he began seeing Dr.

---

[4] Even when the treating physician rule applied, the ALJ was still free to discount a treating physician's opinion as long as he provided "good reasons" for doing so.  *E.g.*, *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998).

Bernard, after struggling with a prior therapist.  Tr. 428-30.
Dr. Bernard examined (and treated) Yucekus multiple times before
submitting an opinion to the Social Security Administration.
*See* Tr. 419, 429, 471, 490.  During these sessions, Dr. Bernard
reported "paranoid delusions" requiring anti-psychotic
medications, Tr. 419, a complete lack of social life or activity
beyond staring at the television and seeking medical attention,
Tr. 429, "excessive worry," "difficulties in relationships with
others," "irritability and emotional reactivity," and
"maladaptive cognitions."  Tr. 472.

Dr. Bernard additionally submitted a Psychiatric /
Psychological Impairment Questionnaire in July 2019 in
connection with Yucekus's disability application.  Tr. 619.
This included a set of check-box questions, as well as questions
that required written, narrative answers.  *Id.*  In the opinion,
Dr. Bernard described Mr. Yucekus' treatment for schizoaffective
disorder, (depressive type), generalized anxiety disorder, post-
traumatic stress disorder, and listed the clinical signs and
symptoms supporting the diagnosis.  Tr. 619-20.  The most
frequent and severe of these symptoms were "fears of bad things"
happening to him and avoiding social interactions.  Dr. Bernard
checked boxes indicating "marked" limitations in eleven of the
twenty-three listed mental categories, including the ability to
work in coordination with or near others without being

distracted by them, the ability to understand and remember detailed instructions, and the ability to sustain an ordinary routine without supervision.  Tr. 622-23.  He found "moderate-to-marked" limitations in another eleven categories, such as making simple work-related decisions and maintaining socially appropriate behavior.  *Id.*  Although standardized check-box forms are less informative, and entitled to less weight, than full narrative medical reports, *see Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004), this questionnaire included substantive narrative responses as well, and was supported by Dr. Bernard's earlier written examination reports.  *Id.*

Similarly, the consultative examiner, Dr. Georgiou, diagnosed schizoaffective disorder and opined that Yukecus may have difficulties regulating his emotions, maintaining a regular work schedule, working at a consistent pace, interacting with others, and making work-related decisions.  Tr. 410-11.  During Dr. Georgiou's examination, Yucekus described his treatment history and symptoms, including withdrawal, fatigue, and paranoia, among others.  Tr. 409.  He further described his ability to take public transportation, attend appointments, dress, bathe, groom, and manage his money, though he reported his ability to do certain chores was limited and he spent most of the day "staring at the walls."  Tr. 410.  Dr. Georgiou found Yucekus to be cooperative, with a fair manner of relating;

disheveled in appearance with fair-to-poor grooming; and to have monotonous speech, adequate expressive and receptive language, coherent and goal-directed through processes, a flat affect, dysthymic mood, intact attention and concentration, mildly impaired memory, average cognitive functioning, and fair insight and judgment.  Tr. 410.

ALJ Iwuamadi, however, found both examining physicians' opinions "not persuasive."  Tr. 21-22.  In reaching this conclusion, she reasoned that Dr. Bernard's opinion was "not supported by [his own] examinations," Dr. Georgiou's opinion was "not supported by the examination findings," and that both opinions were "not consistent with the longitudinal medical evidence."  *Id.*  In particular, ALJ Iwuamadi cited to Dr. Bernard's office treatment records and psychiatric mental status examinations, which the ALJ decision described as "normal . . . in regard to memory, concentration, appearance and behavior."  *Id.*  She also noted the mental status notes from Dr. Georgiou's consultative examination, which reported certain normal findings, including that Yucekus was "cooperative" and had a "fair manner of relating," as well as a "coherent and goal directed thought process" and average cognitive functioning.  *Id.*; Tr. 410.  This exam also found that he had a flat affect, somewhat disheveled appearance, mild memory impairment, and fair to poor grooming.  *Id.*

ALJ Iwuamadi did not grapple with Yucekus's diagnosis of schizoaffective disorder, which is consistent between the two physicians who examined Yucekus in person and supported by symptoms as far back as July 2018 and possibly earlier, according to Dr. Bernard.  Tr. 623.  This, despite the fact that the schizoaffective diagnosis appeared in the same medical records she cited in support of her conclusions that Yucekus's mental examinations were "mostly normal," and his social impairments "not greater than moderate."  Tr. 14, 18-19, 22-23. She similarly did not address many other serious symptoms in the record evidence, including Yucekus's consistent reports of paranoia and his avoidance of social interaction, Tr. 409, 621, nor his reports of sleep disturbances, apathy, and feeling "frozen."  *Id.*

For example, Dr. Bernard's treatment notes report symptoms such as "crippling" anxiety, Tr. 421, minimal progress over time in reaching mental health objectives, Tr. 700-04, and paranoid delusions that required management with antipsychotic medication.  Tr. 419.  As the Second Circuit has noted, it is typical for mental health symptoms to wax and wane over time, which is why ALJs must "reconcile or grapple with the apparent longitudinal inconsistencies in [a claimant's] mental health." *Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019).

In determining the persuasiveness of medical opinion evidence and making an RFC determination, "[i]t is not proper for the ALJ to simply pick and choose from the transcript only such evidence that supports his determination, without affording consideration to evidence supporting the plaintiff's claims.  It is grounds for remand for the ALJ to ignore parts of the record that are probative of the claimant's disability claim." *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004), *accord Maragl v. Colvin*, 13-CV-2435, 2015 WL 4600542, at *17 (E.D.N.Y. July 29, 2015) ("The ALJ may not 'pick and choose' from the transcript only such evidence that supports her decision."); *see also Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975) (remanding in part because certain evidence "was not explicitly weighted and considered by [the ALJ], although such consideration was necessary to a just determination of a claimant's application").  Thus, in failing to account for the full spectrum of Yucekus's mental health symptoms, ALJ Iwuamadi did not support her decision with substantial evidence.

The ALJ's references to Yucekus's apparent lack of hospitalizations and reports of daily activities do not make up for this deficiency.  ALJ Iwuamadi noted that no psychiatric hospitalizations were reflected in Mr. Yucekus's records, "at least not since his twenties."  Tr. 21-22.  While the actual records associated with this hospitalization in his twenties are

not in the record, Yucekus and his providers are consistent in reporting a psychiatric hospitalization roughly ten years earlier, when Yuckekus was approximately twenty-eight years old. Tr. 409, 619.  The order largely dismisses the significance — and arguably the fact — of this hospitalization.  Tr. 21-22. But even if there were no such indication of hospitalization in the record, a lack of psychiatric hospitalizations does not equate to a lack of disability.  *See Voigt v. Colvin*, 781 F.3d 871, 876 (7th Cir. 2015) ("The institutionalization of the mentally ill is generally reserved for persons who are suicidal, otherwise violent, demented, or (for whatever reason) incapable of taking even elementary care of themselves" and the absence thereof does not preclude a finding of psychiatric disability).

Similarly, ALJ Iwuamadi observed that Mr. Yukecus's activities, including cleaning, laundry,[5] taking public transport, and grocery shopping, are inconsistent with the marked limitations noted in Dr. Bernard's and Dr. Georgiou's opinions.  Tr. 21-22.  However, "a claimant need not be an invalid to be found disabled," and the ability to do routine daily tasks can be consistent with a finding of disability. *Murdaugh v. Sec. of Dep't of HHS of U.S.*, 837 F.2d 99, 102 (2d

---

[5] As mentioned below, the record is at least mixed regarding Yucekus's ability to do laundry, *see* tr. 64-65, which is notable given the vocational expert's opinion that his RFC permitted him to work as a "laundry assorter." Tr. 23-24.

Cir 1988); *see also* 20 C.F.R. Pt. 404, Appendix 1 of Subpart P §
12.00(D)(3)(a) ("[T]he fact that you have done, or currently do,
some routine activities without help or support does not
necessarily mean that you do not have a mental disorder or that
you are not disabled.").

This is particularly true where, as here, the
remaining record suggests that the claimant's daily activities
are in fact quite limited by his psychological impairments.  For
example, Dr. Georiou's records reflect that Yucekus spends the
majority of his time "on the couch staring at the walls" without
any television or music playing, Tr. 410, and Yucekus testified
that he leaves home only to go to medical appointments and
grocery shop, which he does late at night, *id.* at 62-64; that he
must overcome his anxiety to take public transport, *id.* at 14;
showers only once a month and has difficulty dressing, *id.* at
65-69; and does not do laundry[6] or drive.  *Id.* at 64-65.

Finally, the Social Security Administration's
psychological consultants reviewed the record in January and
April 2019, respectively.  They found that Yucekus could follow
supervision, perform simple tasks, relate with co-workers in a
setting in which he would not have frequent contact with the
public, and adequately sustain attention and respond to changes

---

[6] *See supra* note 5.

in the work setting.  Tr. 131, 148.  ALJ Iwuamadi found these assessments "mostly persuasive" because the "consultants supported their findings with detailed medical evidence, and their findings are mostly consistent with the longitudinal medical evidence."  Tr. 22.  She then walked through the "detailed medical evidence" that the consultants used to support their findings, including the mental status examinations with Dr. Georgiou, longitudinal mental status examinations, Mr. Yucekus's treatment history, and Yucekus's daily activities.  Tr. 23-23.  However, the psychological consultants evaluated the record in 2019, well before ALJ Iwuamadi finalized her opinion and before the record was complete.  Tr. 124-31, 141-48.  Further, much of the medical evidence that the consultants analyzed in reaching their conclusion were records from the treating and examining physicians whose opinions ALJ Iwuamadi found unpersuasive.  Thus, the opinions of consultants who did not assess Yucekus in person, reviewing an incomplete record, which themselves are found only "mostly" persuasive, do not constitute sufficiently substantial evidence to make up for the gaps identified above.

In sum, ALJ Iwuamadi's opinion regarding Yucekus's mental limitations was not supported by substantial evidence, and she did not adequately assess the medical opinion evidence in the record.

2.   <u>Evidence Regarding Yucekus's Right Arm Impairment</u>

Yucekus additionally argues that ALJ Iwuamadi improperly rejected the opinions of his treating physicians with respect to his right arm impairment.  This impairment consists primarily of a chronic nerve condition and thoracic nerve injury, as well as a right shoulder winged scapula and brachial plexus disorder, which causes pain, weakness, and a winging position in his right shoulder.  Tr. 12.  Although Yucekus has adduced evidence suggesting these impairments impose challenges to his physical functioning, ALJ Iwuamadi properly listed them as "severe" impairments, and her RFC determination was supported by substantial evidence with respect to these limitations.

In assessing Yucekus's RFC, ALJ Iwuamadi considered evidence from Yucekus's treating internist Dr. Avedissian, the Social Security Administration's examining physician Dr. Samuels, and the agency's medical consultants, Dr. Feldman and Dr. Lee.  Tr. 20-21.  First, Dr. Avedissian found that Yucekus had no limitation in his left arm but that his "right arm is lost," due to weakness, pain, and limited motion.  Tr. 580-81.  Applying the factors mandated by Section 404.1520, ALJ Iwuamadi found this "not persuasive," because "Dr. Avedissian's records do not support the opinions" and "the longitudinal medical evidence is not consistent with the opinions."  Tr. 21.

In particular, ALJ Iwuamadi noted Yucekus's refusal to have his right shoulder examined by a neurologist, Tr. 499, and that an EMG test — an electrical test that assesses the muscle response to nerve stimulation — on the right upper extremity showed mild radiculopathy and mild carpal tunnel syndrome, Tr. 582. In addition, ALJ Iwuamadi discussed the record regarding Yucekus's neurological testing, the fact that there are no positive MRI scans of the spine, and evidence of his daily activities that undermine a finding of complete disability of the right arm. Tr. 21.

Next, Dr. Samuels, the Social Security Administration's examiner, found that Yucekus had moderate to marked restriction reaching over the head using the left upper extremity and shoulder, pushing, pulling, lifting, carrying heavy objects, prolonged standing or sitting, and that he should avoid heights and heavy machinery. Tr. 20. ALJ Iwuamadi also found Dr. Samuels's opinion "not persuasive" because it is not supported by the physician's own "examination findings, and it is not consistent with the longitudinal medical evidence." *Id.*

In so finding, ALJ Iwuamadi cited substantially to the record of Dr. Samuels' examination, which established that Yucekus had reduced range of motion in his shoulders with moderate kyphosis secondary to his winged scapula, but there was no sensory deficit. Tr. 414-15. This examination also noted

that Yucekus had full strength in his right arm and full bilateral grip strength with intact hand and finger dexterity, but 4/5 strength in his left arm.  Tr. 415.  It must be noted here that this exam assessed limitations in the left arm, although the remainder of the record indicates issues with the right arm.  *See* Tr. 412-16, 410, 499, 630.  This reference to the left arm is carried through to the agency consultants, discussed below.  Tr. 127-29, 144-46.  ALJ Iwuamadi also noted that the exam revealed no cyanosis, clubbing or edema and no muscle atrophy.  Tr. 20.  She explained that Yucekus did not use an assistive device during the exam, although he did require assistance getting on and off the examination table and rising from a chair.  Tr. 414.  Ultimately, ALJ Iwuamadi found that "[a]ll objective testing noted above indicates that the condition is mild" and that Yucekus had at most "moderate restrictions with the right upper extremity."  Tr. 20.

Finally, ALJ Iwuamadi contrasted the above opinions with those of the medical consultants, who opined that Yucekus could perform less than a full range of light work with postural, manipulative and environmental limitations.  Tr. 127-33, 144-50.  She found these opinions to be "persuasive," because they were supported by "detailed medical evidence" and mostly consistent with the longitudinal medical evidence.  Tr. 21.  In support, ALJ Iwauamadi cited to Yucekus's EMG testing

and neurological testing, his later refusal to have his shoulder examined by a neurologist, and MRI scans of his spine. *Id.* She additionally cited Yucekus's daily activities, including grooming, taking public transport, and grocery shopping. *Id.*

Thus, ALJ Iwuamadi assessed the two most important factors, supportability and consistency, for each medical opinion, with specific references to the medical evidence and Yucekus's testimony. 20 C.F.R. §§ 404.1520c(c). Further, even where the ALJ's determination does "not perfectly correspond with any of the opinions of medical sources cited in [her] decision, [she] was entitled to weigh all of the evidence available to make an RFC determination that was consistent with the record as a whole." *Matta*, 508 F. App'x at 56; *Trepanier v. Comm'r of Soc. Sec. Admin.*, 752 F. App'x 75, 79 (2d Cir. 2018).

Finally, Yucekus argues that the RFC was flawed, because the medical experts identified limitations in Yucekus's ability to reach in all directions, Tr. 128, 145, 414-15, 580-81, and ALJ Iwuamadi assessed an RFC including only occasional bilateral reaching overhead, but frequent reaching around. Tr. 15. This discrepancy, however, does not require remand. For one thing, as discussed above, the evidence conflicts as to which arm the medical experts assessed limitations in. Further, while each medical expert identified limitations to reaching in only one arm, the ALJ was in one respect more conservative,

limiting Yucekus's RFC to occasional overhead reaching
bilaterally.   *Id.*

In addition, the vocational expert identified jobs in
the national economy in significant numbers, even if Yucekus
were further limited to occasional reaching in all directions.
Tr. 71-76.   Ultimately, although Yucekus has identified evidence
in the record that suggests limitations in his use of one arm,
such as the conflicting assessments of the agency consultants
and Yucekus's treating physician, the ALJ's determination was
supported by substantial evidence, and "[i]t is for the SSA, not
this court, to weigh the conflicting evidence in the record."
*Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998).

**B.   Subjective Complaints**

Finally, ALJ Iwuamadi sufficiently considered
Yucekus's subjective complaints under Social Security Ruling 16-
3p Titles II & XVI: Evaluation of Symptoms in Disability Claims,
SSR 16-3P (S.S.A. Oct. 25, 2017) ("SSR 16-3p").   In evaluating
Yucekus's symptoms, ALJ Iwuamadi followed the two-step process
proscribed by 20 C.F.R. § 416.929(b) and SSR 16-3p.   First, she
determined that Yucekus's "medically determinable impairments
could reasonably be expected to cause the alleged symptoms."
Tr. 17.   At step two, she determined that Yucekus's "statements
concerning the intensity, persistence and limiting effects of
these symptoms are not entirely consistent with the medical

evidence and other evidence in the record." *Id.* At this second step, SSR 16-3p directs ALJs to consider: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; (6) measures other than treatment used to relieve pain or other symptoms; and (7) any other relevant factors concerning the individual's limitations and restrictions due to pain or other symptoms.

Here, as discussed above, ALJ Iwuamadi examined Yucekus's course of treatment, including physical and psychological examinations, testing, scans, and medical opinions. Tr. 15-23. She also considered Yucekus's reported daily activities throughout the opinion, Tr. 20-22, his lack of physical therapy, Tr. 18, and his medications, *id.* Thus, she followed the appropriate procedure regarding Yucekus's subjective statements and supported her findings with substantial evidence from the record.

## IV. Conclusion

For the reasons set forth above, the Court grants Yucekus's motion for judgment on the pleadings and denies the

Commissioner's motion.  The ALJ's July 28, 2020, decision is therefore vacated, and the matter is remanded for further administrative proceedings consistent with this Order.  The Clerk of Court is respectfully directed to close the case.

      SO ORDERED.


                /s/ Eric Komitee
               ERIC KOMITEE
               United States District Judge


Dated:    March 29, 2022
          Brooklyn, New York